Filed 4/8/14  P. v. Bell CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>STANLEY BELL II,<br><br>　　　　Defendant and Appellant. | B245980<br><br>(Los Angeles County<br>Super. Ct. No. PA068474) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David W. Stuart, Judge.  Affirmed.

Gerald Peters, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted appellant Stanley Bell II of four felonies: Corporal injury to a cohabitant (Pen. Code, § 273.5, subd. (a)[1] (count 7); assault with a deadly weapon (knife) (§ 245, subd. (a)(1) (count 9); assault by means likely to produce great bodily injury (§ 245, subd. (a)(1) (count 10); and false imprisonment by violence (§ 236) (count 12). The jury also found true the allegation in count 7 that appellant personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)). The jury acquitted appellant of 11 other counts against him.[2]

The trial court found true the allegations that: (1) under section 667.5, subdivision (b) appellant had suffered two prior convictions for which he served a term of imprisonment; (2) under section 667, subdivision (a)(1) appellant had suffered two prior serious felony convictions; and (3) under section 1170.12, subdivisions (a) through (d) and section 667, subdivisions (b) through (i) appellant had suffered two prior convictions for a serious or violent felony of juvenile adjudication.

Appellant was sentenced to a prison term of 36 years to life: On count 7, the base term, appellant received 25 years to life (as a third strike), plus five years each for the two prior serious felony convictions, plus one year for using a knife. He also received two years each for the two prison priors, which were stayed. The trial court stayed the sentence on count 9 under section 654, and ordered appellant to serve concurrent sentences of 35 years to life on counts 10 and 12. Appellant received presentence custody credit of 946 days.

Appellant contends (1) the prosecutor committed misconduct, (2) the trial court erroneously excluded certain evidence, and (3) the trial court erred in imposing certain enhancements. We disagree and affirm the judgment.

---

[1]     All statutory references are to the Penal Code unless otherwise indicated.

[2]     These counts consisted of other alleged incidents involving the same victim, including corporal injury to a cohabitant, assault, attempted murder, kidnapping, and robbery.

## FACTS

**Prosecution Case**

In 2010, appellant and the victim, K.M. (K.), were dating. From February to August 27, 2010, appellant lived largely uninterrupted with K. and her two daughters, ages 10 and eight, at her apartment in Tujunga, California. Appellant did not pay rent or contribute financially, other than buying gas for K.'s car, which he used. She gave him money, which he used to gamble and he bought a Mercedes with his winnings.

Appellant's mother testified that K. told her three times she wanted to kill herself because appellant had broken up with her. On the Sunday before August 26, 2010, K. called appellant's mother and said she wanted to kill herself. Appellant's mother did not take K. seriously. K. had appellant's name tattooed on her back, wrist, and left ring finger.

On August 26, 2010, K. returned to her apartment to find appellant inside. They had reconciled two days earlier. Appellant was taking a bottle of gin out of the freezer and said they needed to talk about some pictures of her he had found. K. took a shower first. When she was done, appellant asked if he could dry her off. She said no and appellant came up behind her carrying something wrapped inside a black T-shirt. K. eventually sat down on the bed between appellant's legs, with her back to him, to let him dry her off. She felt a sting on the side of her right lower back, near her hip. When she tried to turn around to see what caused it, she felt a more painful sting. K. saw that appellant was holding a taser. K. began crying and asked appellant to stop and tell her what was going on. Appellant threw K. face down onto the bed and tased her multiple times on her neck. Appellant choked K. twice.

Appellant then dragged K. to her daughters' bedroom, where she saw cigarettes, a lighter, a folding knife, a roll of duct tape, and black trash bags. When K. tried talking to appellant, he punched her with a closed fist to the right side of her face. Appellant smashed a pillow into K.'s face and told her that if she screamed, she would die sooner than she was supposed to die. He punched her again and wrapped duct tape tightly around her mouth, face and ankles and bound her wrists together behind her back.

3

With the knife, appellant cut the letter "S" across her back for his name, Stanley. She also felt a burning sensation and blood on her buttocks. Appellant resumed tasing K., which caused one of her acrylic toenails to come off. He tased her nipples and other parts of her body.

Appellant finally stopped tasing K., and told her that he wanted to marry her in Las Vegas. He untied her and let her shower and clean up. He then drove her to several places, including a 7-Eleven, a casino, a fast-food restaurant, and his uncle's house, where she stayed the night.

The next morning, August 27, 2010, appellant drove K. to her apartment. She told him she needed to register her daughters for school, and he let her take her car while he stayed behind. K. drove to the Pasadena Police Department and tried to report what had happened. A woman at the police station told K. that she needed to report the crime at a different police station because Tujunga was not in that department's jurisdiction.

K. then drove to an In-N-Out Burger location near her apartment in Tujunga and called the police from there. Officers found her crying and hysterical, saying she had been cut and stabbed. When asked where she had been stabbed, she pulled down her pants and the officers saw a deep cut to her buttocks. The officers drove K. to her apartment, but appellant was not there. The officers took K. to the police station to get her statement. There was blood in the back seat from her cuts. At the police station, K. was fearful and scared. She mentioned a taser or stun gun and revealed a burn mark on her head.

An ambulance took K. to a Kaiser facility in Panorama City. Dr. Joseph Choi was working in the emergency room and examined K. She told Dr. Choi that she had been hit in the head, face, and back, and that she had been choked. Dr. Choi used adhesive strips to close a six-centimeter superficial laceration over K.'s right buttocks. He observed abrasions on her back. A subconjunctival hemorrhage in one of K.'s eyes was consistent with having been hit in the head or choked.

On August 29, 2010, appellant was arrested at the Mexican border, trying to reenter the United States from Mexico.

4

On August 30, 2010, Detective Adrienne Hamilton of the Los Angeles Police Department (LAPD) met K. at her apartment. Detective Hamilton observed redness in both of K.'s eyes. K. had burn marks on her neck and body, and cuts on her right buttocks and back. K.'s face had some swelling and some bruising.

On September 6, 2010, Nicole Garcia Elkin (Elkin), an advocate with the Domestic Abuse Response Team, met with K. at the Van Nuys Police station. The interview took about three and a half hours. Elkin observed injuries to K.'s face, chest, arms, the letter "S" carved into K.'s back, and a deep puncture wound to K.'s right buttocks. Elkin observed burn marks on K.'s nipple, her neck, stomach, and arms, and one of her toenails appeared to have burn marks on it. Both sides of K.'s face had swelling. K. said that she had been strangled and had passed out twice in her bedroom. K. became hysterical about 90 minutes into the interview.

**Defense Case**

Appellant's sister testified that K. frequently drank alcohol and that she never heard appellant verbally abuse K.

Appellant testified that between February and August 2010, he worked for Clark's Trucking, driving 10-wheelers, and for Erbe's Refinishing, refinishing pianos. During that time, K. gave him at least $20,000, though he never asked for money. He was aware that K. had committed tax fraud by claiming extra dependents, but denied telling her to do it or how to do it. K. drank alcohol every day after work, and every time that appellant was with her. She smoked cigarettes and marijuana, and used the drug Ecstasy.

Between February and August 2010, K. sent text messages to appellant telling him that she had invested too much time and money in him, and that he would sit in prison for the rest of his life for playing with her emotions.

On August 26, 2010, appellant was at work when K. called him at least 100 times, "no exaggeration." She asked him to help her move some heavy objects from upstairs in her apartment to her garage. Appellant told her he was busy; he planned to go to a casino that night and then to Mexico. After more conversation, he agreed to help her. Later at her apartment, appellant said some "hurtful" things to her. When he started to leave, K.

5

began to cry and shake uncontrollably, which "kind of scared" him. K. threatened to call the police and have him sent to prison. Appellant tried to "play [it] nonchalantly," like it did not bother him, but it did.

When appellant left K.'s apartment, he went to the casino. After gambling for awhile, he went to his mother's house in Murietta and ate some food, then went to Mexico. After a few days in Mexico, he was detained at the border when he tried to reenter the United States.

Appellant denied that he ever slapped, punched, kicked, tied up, cut, stabbed, tased or kidnapped K.

On cross-examination, appellant testified that he first met K. in the summer of 2007. After that, he was in custody until he "paroled" to her apartment in February 2010. He lived with her for only two to three weeks until he realized he did not love her, and he moved into his uncle's house in Cerritos. Appellant never told his parole agent that he had moved in with his uncle. Despite only living with K. for such a short time, he had tattoos of her name and her daughters' names.

## DISCUSSION

### I. Prosecutorial Misconduct

Appellant contends that the prosecutor committed prejudicial misconduct when she elicited from him on cross-examination that he went to prison shortly after he met K. in 2007, and that he was on parole when he lived with her in 2010. He also contends that if we conclude this issue has been forfeited on appeal, he received ineffective assistance of counsel.

*Relevant Proceedings*

The trial court initially ordered the prosecution and witnesses not to inform the jury that appellant had "strikes" against him, had been in prison, and had been on parole when he moved in with K. During the prosecution's case-in-chief, the prosecution and witnesses complied with the court's order.

During his direct examination, appellant brought up that he was a convicted felon with two strikes against him, he was "walking on egg shells" because he was concerned

that he might get another strike, K. sent him text messages saying that he would sit in prison for the rest of his life for playing with her emotions, and on August 26, 2010, K. threatened to call the police and have him sent back to prison.

During her cross-examination of appellant, the prosecutor elicited from appellant that he was in custody shortly after meeting K. in 2007 and that he paroled to K.'s apartment when he got out of prison. Defense counsel did not object to this exchange. The prosecutor also elicited from appellant that he sometimes wrote letters back and forth to K. while he was in prison. Defense counsel did not object to this exchange either. When the prosecutor asked appellant if K.'s apartment was the address he had provided to his parole agent, defense counsel objected on the grounds of relevance and materiality and violation of due process. The trial court overruled the objections.

After the prosecutor finished cross-examining appellant, the trial court responded to defense counsel's earlier objection that the cross-examination had violated appellant's due process, stating: "Obviously, the fact of defendant's prior convictions, and his time in prison and on parole, and the fact that he is a—he believes he's a three striker, facing life in prison, has all come out. And all of that came out because of the defendant. He opened the door, he brought it up, he made it relevant. And the relevance is as to his state of mind. Why would I commit a crime when I know I'm a three-striker? And it does have some relevance, and he brought it up. So the door has been opened. I don't see any due process violation here. [¶] And all the questions asked on cross-examination were proper, in my view."

### *Applicable Law*

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711; *People v. Maciel* (2013) 57 Cal.4th 482, 541.) "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the

7

impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. Maciel, supra*, 57 Cal.4th at p. 541.)

*Analysis*

When the prosecutor elicited from appellant that he had been in prison and paroled to K.'s apartment, defense counsel did not object. Appellant has therefore forfeited the issue of prosecutorial misconduct on appeal. (*People v. Maciel, supra*, 57 Cal.4th at p. 541.) In any event, we conclude that the prosecutor did not commit misconduct and that appellant was not prejudiced.

Appellant began his direct testimony by admitting that he had convictions for burglary, felony assault and vandalism, and that he had previously pled guilty to a charge of domestic violence. He testified that he only lived with K. for a few weeks because he decided he no longer loved her and he moved into his uncle's house. Appellant then proceeded to paint a picture of K. as an unstable, alcoholic, drug-using tax cheat who was obsessed with him and threatened to have him sent back to prison if she could not have him. Meanwhile, appellant was a two-strikes felon who was "walking on egg shells" and who did nothing wrong because he could not afford to have another felony.

On cross-examination, the prosecutor elicited the following from appellant: his burglary and vandalism convictions were felony convictions; he met K. in mid-2007, a few months before he went to prison; he corresponded with K. while in prison; he moved in with K. when he was released from prison in 2010; he reported to his parole agent that K.'s apartment in Tujunga was his residential address; he never informed his parole agent that he had moved from Tujunga to Cerritos; and he had tattoos of K.'s name and her daughters' names.

We agree with the People that the prosecutor's cross-examination about appellant's time in prison and parolee status was proper and necessary to provide an accurate context for appellant's history and relationship with K. Appellant's direct testimony gave the false impression that he lived with K. for only a few weeks, decided he did not love her, and moved out. The cross-examination showed that appellant's version about his relationship with K., and her purported one-sided obsession with him,

8

was not true. Thus, as the trial court concluded, the prosecutor did not commit any misconduct by cross-examining appellant as she did, following his direct testimony.

Nor was appellant prejudiced by the prosecutor's cross-examination. Appellant argues that the prosecutor's case relied primarily on K.'s testimony, which was full of inconsistencies, contradictions, and improbabilities. Appellant argues: "Given the inherent improbability of [K.]'s testimony, it seems likely a jury would have disbelieved her but for evidence [appellant] was in prison during part of his relationship with [K.] and on parole after he moved in with her. The jury necessarily concluded [appellant] was an evil-doer and, in effect, [appellant] was improperly convicted by character evidence— that he had been incarcerated and was released on parole."

But appellant's argument ignores that the jury acquitted appellant of 11 out of 15 counts against him, including that between August 26 and 27, 2010, appellant attempted to murder K. (count 8), kidnapped her (count 14), and falsely imprisoned her (count 15). The record shows that the jurors submitted several questions to the trial court during their deliberations. This indicates that they took their deliberations seriously and convicted appellant on counts 7, 9, 10, and 12 based on the evidence of his conduct on August 26, 2010, and not based on his status as a parolee who earlier served time in prison.

Moreover, there was ample evidence to support the jury's verdicts convicting appellant for his actions at K.'s apartment on August 26, 2010: count 7 (corporal injury to a cohabitant—tasing, beating, and choking K.), count 9 (assault with a deadly weapon, a knife—carving an "S" into K.'s back and stabbing her in the buttocks), count 10 (assault by means likely to produce great bodily injury—repeatedly punching K. in the head and face), and count 12 (false imprisonment by violence—tying up K. with duct tape in her daughters' bedroom).

Because appellant cannot show that he was prejudiced by the prosecutor's cross-examination, he likewise cannot show that his trial counsel provided ineffective assistance. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 414 [To show ineffective assistance of counsel, appellant must show his trial attorney's "deficient performance

9

under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome"].)

## II. Evidence of Self-Injury

Appellant contends that the trial court committed reversible error by refusing to allow him to present evidence that K. had "a history of 'hurting herself.'"

### *Relevant Proceedings*

While cross-examining appellant's mother, defense counsel asked if K. had ever discussed hurting herself. Before the prosecutor could object, appellant's mother answered, "Yes." At side bar, defense counsel told the trial court, "Basically, whenever [appellant] wants to break up with her, or indicates he wants to break up with her, she wants to kill herself. She wants to cause harm to herself." The court asked, "[S]o she is going to say what? [K.] said she was going to kill herself?" Defense counsel replied, "Yeah, basically. It's like—I haven't interviewed her extensively." The trial court ultimately ruled that "if there is a question and answer where—did [K.] say something about the relationship, yes, she said she was upset and wanted to kill herself because my son didn't want to marry her, I think that would be allowable. But nothing about any prior attempts to hurt herself, or suicide attempts." The court then sustained the objection and struck the answer that K. had discussed hurting herself.

Appellant's mother subsequently testified that K. had threatened to commit suicide on three occasions between February and August 2010 because appellant had broken up with her; the last time was on the Sunday before August 26, 2010. Appellant's mother thought K. was being dramatic and did not take her seriously.

### *Applicable Law*

All relevant evidence is admissible "'unless excluded under the federal or California Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).)'" (*People v. Heard* (2003) 31 Cal.4th 946, 972–973.) Relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence" to the action. (Evid. Code, § 210.) A trial court has broad discretion to exclude relevant evidence if its "probative value is substantially outweighed by the

10

probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Horning* (2004) 34 Cal.4th 871, 900; *People v. Jones* (2011) 51 Cal.4th 346, 373.) Thus, we review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717; *People v. McDowell* (2012) 54 Cal.4th 395, 430; *People v. Rogers* (2013) 57 Cal.4th 296, 326.)[3]

*Analysis*

Appellant argues that K.'s "predilection for self-inflicted injury was crucial" to his defense that he did not hurt her. He claims there was "no independent evidence of many of [K.'s] injuries and the list of injuries observed by independent witnesses grew over time." He asserts that "[s]ignificant evidence casts doubt on [K.]'s testimony and, at a minimum, makes it plausible that her injuries were self-inflicted." He therefore concludes that evidence of K.'s history of self-inflicted injuries "would likely have led a reasonable jury to disbelieve the entirety of [K.]'s testimony" and to believe that "[K.]e injured herself as part of a scheme to 'get even' with [appellant] for ending their relationship."

The problem with this argument is that appellant never made any showing that K. had a history of self-inflicted injuries. He never made any showing that she had actually ever harmed herself or that she had actually attempted to commit suicide. Thus, we find no abuse of discretion by the trial court. (Evid. Code, § 354; *People v. Lightsey* (2012) 54 Cal.4th 668, 714 [absent offer of proof, no abuse of discretion to foreclose further

---

**3**     See also Evidence Code section 354: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means; [¶] (b) The rulings of the court made compliance with subdivision (a) futile; or [¶] (c) The evidence was sought by questions asked during cross-examination or recross-examination."

11

questioning on subject]; *People v. Vines* (2011) 51 Cal.4th 830, 868–869 ["defendant made no offer of proof or attempted otherwise to advise the court of the substance and purpose of the testimony he sought to elicit. He thus does not show entitlement to relief"].)[4]

## III. Five-Year Enhancement under Section 667

Appellant contends that the trial court erred in imposing a five-year enhancement under section 667 based on his conviction for first degree (residential) burglary because the information alleged only that he had suffered a burglary conviction, not a conviction for first degree (residential) burglary.

Appellant did not demur to the information, so he has forfeited this issue on appeal. (*People v. Thomas* (1986) 41 Cal.3d 837, 841, 843 [claimed defect in information alleging as prior serious felony convictions only prior "burglary" convictions and not residential burglary convictions was "one of uncertainty only" and was "waived by defendant's failure to demur"].)

In any event, this contention has no merit. The information alleged that "pursuant to Penal Code section 667[, subd.] (a)(1)" appellant had suffered two prior convictions "of a serious felony," one of which was for having violated section 459 (burglary). By its express terms, section 667, subdivision (a) permits an enhancement only if the prior conviction was for a "serious" felony. Qualifying "serious" felonies are listed in section 1192.7, subdivision (c). First degree burglary is a "serious" felony. (§ 1192.7, subd. (c)(18).) The information therefore put appellant on notice that the prosecution was claiming that his burglary conviction under section 459 was a conviction for first degree burglary, not second degree burglary. Moreover, appellant admitted during cross-examination at trial that he had been convicted of residential burglary. And after the jury

---

**4**      Appellant also contends that "the cumulative effect" of the prosecutor's misconduct and the trial court's errors denied him a fair trial and requires reversal. Because we have found there was no prosecutorial misconduct or trial court error, this contention is moot.

trial, but before appellant admitted this prior conviction to the trial court, the court expressly advised him that this conviction was for first degree residential burglary.

## IV. Enhancement Under Section 667.5

Appellant contends that the one-year enhancement under section 667.5 imposed (and stayed) by the trial court based on appellant's conviction for vandalism under section 591 must be stricken because: (1) section 591 is a "wobbler" and the information did not allege that the vandalism conviction was a felony conviction, and (2) the evidence did not prove that appellant was convicted of felony vandalism. These contentions are also without merit.

The information alleged that "pursuant to Penal Code section 667.5[, subd.] (b)" appellant had suffered two prior convictions, one of which was for having violated section 591, and that appellant had served a "term," as described in section 667.5 for those offenses. By its express terms, section 667.5, subdivision (b) permits an enhancement only if the prior conviction was for a felony. (§ 667.5, subd. (b) ["the court shall impose a one-year term for each prior separate prison term" served for any felony].) The information thus put appellant on notice that the prosecution was claiming that his vandalism conviction was a felony conviction. Moreover, appellant did not demur to the information, so he forfeited this issue by not raising it in the trial court. (*People v. Thomas, supra*, 41 Cal.3d at p. 843.)

With respect to both notice and the sufficiency of the evidence, appellant admitted during cross-examination at trial that he had been convicted of felony vandalism. And when admitting this prior conviction to the trial court, appellant admitted that he went to prison for it, further confirming that it was a felony, and not a misdemeanor, conviction.

13

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, Acting P. J.
         ASHMANN-GERST

We concur:

_____, J.
         CHAVEZ

_____, J.[*]
         FERNS

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14